**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> for the use and benefit of ) <br> PILECO, INC., ) <br> ) <br>        Plaintiff, ) <br> ) <br>        v. ) <br> ) <br> SLURRY SYSTEMS, INC. and ) <br> FIDELITY AND DEPOSIT ) <br> INSURANCE COMPANY OF ) <br> MARYLAND, ) <br> ) <br>        Defendants. ) <br> ----------------------------) <br> SLURRY SYSTEMS, INC., ) <br> ) <br>        Third Party Plaintiff ) <br> ) <br>        v. ) <br> ) <br> BAUER MASCHINEN GMBH, ) <br> ) <br>        Third Party Defendant.) | Case No. 09 C 7459 <br><br> Magistrate Judge Arlander Keys |

## MEMORANDUM OPINION AND ORDER

In this lawsuit, the United States Government, on behalf of Pileco, Inc.,[1] has sued Slurry Systems, Inc. ("SSI") and its surety, Fidelity and Deposit Company of Maryland ("F&D"), seeking to recover money allegedly owed on a contract executed in connection with a reservoir project undertaken by the Army Corps of Engineers in Willow Springs, Illinois. In its complaint, Pileco alleged two counts: Count One, asserted under the Miller

---

[1]For ease of reference, the Court will refer to the plaintiff as Pileco.

Act, seeks payment on a payment bond, issued by F&D, in connection with the project; and Count Two alleges breach of contract and seeks monetary damages in excess of $4 million from SSI. SSI answered the complaint, and, along with its answer, filed a counterclaim against Bauer Maschinen and Pileco, alleging that, in connection with the reservoir project, it subcontracted with Pileco and Bauer to provide certain equipment necessary to the job, that the equipment never worked properly, that Pileco and Bauer breached their agreement with SSI, and that SSI paid Pileco all that it was due under the contract.

The case is before the Court on a number of motions, all of which are denied.

## Background

Slurry Systems, Inc. is a speciality foundation contractor which constructs slurry walls and installs earth retention systems for a variety of private and public construction projects. In connection with one such project – a project known as the Chicago Underflow Program ("CUP")/McCook Reservoir/Stage 2 Cutoff Wall – SSI submitted a bid to the Army Corps of Engineers to build a cutoff wall, and won. On January 18, 2006, the Army Corps of Engineers and SSI entered into a contract, whereby SSI was to perform certain tasks in connection with the CUP Reservoir project (namely, digging through 35 to 60 feet of soil, cutting into the underlying bedrock a depth of 2 to 5 feet for the

construction of a soil-bentonite cutoff wall.  As is generally the case with government projects, SSI was required to supply a bond as a prerequisite for bidding on the job, and it did so.  On January 24, 2006, F&D issued a payment bond in accordance with the Miller Act, with SSI as principal, the United States of America as obligee, and F&D as surety.

SSI determined that it was necessary to subcontract certain equipment to complete its work on the project, and, on December 7, 2006, SSI and Pileco entered into a rental agreement, whereby Pileco agreed to provide to SSI a BC40 Trench Cutter, as well as other equipment necessary to the CUP Reservoir project, and SSI agreed to pay Pileco a rental fee in the amount of $88,800 per month; the agreement was backdated, with an effective date of October 19, 2006.

Actually, there is a larger back story to the rental agreement.  Even before SSI submitted its bid for the CUP Reservoir Project, it asked Bauer Machinen, Pileco's parent company, to get involved.  According to SSI, SSI contacted Bauer on or about October 25, 2005, shortly after the Army Corps of Engineers solicited bids for the CUP McCook Reservoir Project, and asked Bauer to assist it in preparing its bid.  According to SSI, Bauer recommended the necessary equipment to complete the Project and was instrumental in helping it figure out exactly what it needed to perform the work required for the project.

According to SSI, Bauer "became actively involved in the Project bid preparation and supplied extensive information to SSI for the submission of SSI's bid for the Project." SSI's Second Amended Counterclaim and Third-Party Complaint, ¶12. Bauer "specifically recommended that SSI use a BC40 Cutter" and "selected for SSI a large, commercial crane manufactured by Liebherr (Model 885) . . . . which is necessary to hold, lift and operate the Cutter." Id. Bauer provided preliminary quotations for the necessary equipment, but advised SSI that it planned to have its wholly-owned subsidiary, Pileco, actually issue and sign the final contract. Id., ¶19-20. Apparently, no one questioned this decision, and there does not appear to be anything in the record to disclose the reasons for this arrangement. But, in any event, this is exactly what occurred: on or about May 9, 2006, Bauer provided to SSI – on Pileco letterhead – the final quote for the lease of the cutter and related equipment, which the parties signed on December 7, 2006, with an effective date of October 19, 2006. Id., ¶20. Despite the introduction of Pileco, SSI continued to deal directly with Bauer, and, even Pileco's people admitted that Bauer controlled the deal. George Smith, Pileco's CEO at the time and the man who signed the agreement on behalf of Pileco, testified that Bauer negotiated and drafted the agreement and that Bauer "owned the business, they controlled everything." Deposition of George Smith, p. 29 (attached as Exhibit 3 to SSI's

Response to Bauer's Motion to Dismiss).

The cutter was delivered to the job site and SSI began cutting operations in October of 2006. SSI and F&D contend that the cutter was a lemon from the start; even Pileco concedes that the cutter was inoperable for more than 120 days. The parties went back and forth about parts, operations, repairs, credits, etc. Some issues were covered under warranty and some were not; Bauer and Pileco credited SSI for some repairs and parts, and invoiced SSI for others.

The CUP Reservoir project wrapped up in January 2009, and SSI released and returned the rental equipment to Pileco on January 23, 2009. According to Pileco, SSI received more than $16 million for its work on that project; yet it made only sporadic payments under the rental agreement. According to Pileco, SSI owed it, under the terms of the contract, almost $5 million, yet SSI paid Pileco just $532,800.00. SSI disputes that it owes Pileco anything and has counterclaimed for breach of contract, among other state law claims.

The parties attempted to resolve their disputes. And, on December 1, 2009, Pileco filed this lawsuit. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on January 21, 2011. The case is currently before the Court on a plethora of motions: Pileco has moved for summary judgment on its complaint and on

SSI's counterclaim; F&D has moved for summary judgment on Pileco's Miller Act claim; and Bauer has moved to dismiss certain counts of SSI's Third Party Complaint and for summary judgment on the others. And these motions led to additional motions: Pileco has moved to strike the Statement of Facts filed in response to both of its summary judgment motions, as has Bauer; most recently, F&D filed a motion to dismiss Pileco's and Bauer's motions for failure to prosecute. The Court considers each below.

Discussion

In Pileco's view, this is a simple and straightforward breach of contract case, an appropriate candidate for summary judgment because liability is clear and damages are easily calculated. SSI has attempted to make the case much more complicated, bringing in not only its own breach of contract claim, but also numerous state law claims. Both sides miss the mark. At its core, this *is* a contract case. But it is not a simple, straightforward one. The contract is short, but not clear. And there are so many issues of fact concerning potential breaches by both sides and inexactness about damage calculations that it was clear to this Court from the start that summary judgment was not appropriate. And the defendants' attempts to bring in iffy state law claims hasn't helped the situation; the parties' conduct throughout their relationship and this lawsuit

has made this case far more complicated than it needs to be. Even at its best, however, it would not be as simple as Pileco would like to think. Having said that, the Court turns to the parties' motions.

A. Pileco's Motion for Summary Judgment on Its Complaint

In its complaint, Pileco alleges two counts: a breach of contract count against SSI, seeking to recover rental payments and other amounts it claims it is owed under the rental agreement, and a Miller Act claim against F&D, in which Pileco seeks to recover the same amounts under the payment bond issued in connection with the CUP Reservoir Project.

Summary judgment is granted when the movant shows that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court considers the evidentiary record in the light most favorable to the nonmovant and draws all reasonable inferences in its favor. *E.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). "[T]o avoid summary judgment, a nonmovant 'must produce more than a scintilla of evidence to support his position' that a genuine issue of material fact exists." *Safari Circuits, Inc. v. Chicago School Reform Board of Trustees*, 474 F.Supp.2d 993, 994 (N.D. Ill. 2007) Id. (citing *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir.

2001)). "Ultimately summary judgment is appropriate only if a reasonable jury could not return a verdict for the nonmovant." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### (1)  Pileco's Breach of Contract Claim Against SSI

Based upon the rental agreement, Pileco argues that it is entitled to judgment as a matter of law on the amount due and owing under that agreement. For purposes of its motion for summary judgment, Pileco concedes that the rental equipment was "down" for 120.85 days during the relevant rental period, and it has adjusted its claim to offset a credit on this basis, consistent with the rental agreement; indeed, Pileco alleges that the parties executed an Addendum to their subcontract, which provided for an equitable adjustment to be made in the event repairs or replacement parts were needed for the rental equipment. Pileco contends that it is entitled to judgment on the balance – $4,584,514.60.

Although the math on Pileco's damages calculation is a little muddled, it is clear that it calculated the "offset" to which it thinks SSI is entitled by taking the monthly rental rate (which it claims is $88,800) and dividing it by 30, to come up with a daily rental rate of $2,960, and then multiplying that daily rate by the number of days it says the cutter was down (120.85). None of this is spelled out in the contract, though the

parties' agreement does specifically provide for an "equitable adjustment" to SSI in the event it was "prevented from using PILECO's equipment for any portion of any rental period due to PILECO's lack of performance . . . ." Addendum to Rental Agreement, ¶22. The agreement does not specify a means of calculating the equitable adjustment, but contemplates that the parties will agree to an amount. *Id.* Although it is clear that the parties contemplated the issue in their settlement negotiations, it is not clear that they ever discussed specifically the precise measure of any equitable adjustment under the rental agreement addendum.

In its motion for summary judgment, Pileco argues that this is a simple breach of contract case, that it substantially performed, that SSI breached and that it is entitled to damages as a result. More specifically, Pileco claims that it provided the BC 40 cutter and related equipment to SSI for a period of 27 months; it provided over $1,633,332.05 in repairs and replacement parts, which allowed SSI to complete its work on the CUP Reservoir project; and it provided spare gear boxes, for which it was not paid. Although SSI asserts a number of ways in which Pileco breached the agreement, Pileco argues that the record does not support any of SSI's claims.

In response to Pileco's motion for summary judgment, SSI contends that this is not a simple breach of contract claim and

that the facts giving rise to the dispute are far more involved than Pileco's complaint and motion suggest. SSI contends that there is more to the suit – both factually and legally, than Pileco contends. For example, although Pileco does not mention Bauer, SSI actually negotiated the cutter deal with Bauer, not Pileco – Bauer participated in the bid process and helped SSI secure the contract, yet, after the project was awarded, passed the matter off to Pileco – a then recently purchased, wholly-owned subsidiary of Bauer. SSI contends that, from the get go, its work was delayed because of mechanical problems with the cutter and because of visa problems arising when the operator Bauer sent to the site showed up without the proper work authorization. SSI alleges that it continually experienced major problems with the operation of the cutter due to mechanical breakdowns. SSI also claims that Bauer and Pileco failed to provide replacement parts in a timely manner when parts failed or wore out, and they failed to provide a cutter superintendent, as required under the contract (Pileco claims it didn't provide a superintendent because SSI didn't want to pay for one). All of these problems, according to SSI, caused "severe and substantial delays" in SSI's completion of its work on the CUP Reservoir project, which in turn caused SSI to suffer damages and monetary losses. SSI also alleges that Bauer and Pileco knew about certain design and manufacturing defects in certain component

parts of the cutter, which resulted in the exact kinds of failures SSI experienced, yet failed to disclose those defects to SSI, choosing instead to blame SSI and to misrepresent the true cause of the problems.

Eventually, SSI alleges, SSI, Bauer and Pileco settled their disputes in an agreement reached in principle but never reduced to writing. According to SSI, that agreement provided, among other things, that Pileco would not attempt to collect past due rental amounts or to make a claim on the bond posted by F&D. Thereafter, of course, Pileco filed this lawsuit.

Before turning to the merits of Pileco's summary judgment motion, the Court considers a motion to strike filed by Pileco in response to SSI's responsive statement of facts. Federal Rule of Civil Procedure 56(c) requires a party to support its assertion of fact by citing to particular parts of materials in the record, including depositions, affidavits and declarations; the rule requires that affidavits and declarations so used "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ P. 56(c)(1), (4).

Pileco argues that the joint response filed by SSI and F&D is so deficient under the rule and so far afield that it can only be the case that SSI and F&D are flouting the Court's authority and the Rules of Civil Procedure. The Court does not see that.

For the most part, the responsive statement of facts conforms with the letter and spirit of the rule; the defendants indicated whether the stated fact is disputed or undisputed and, when disputed, they cited to exhibits – mostly deposition transcripts – to support their assertions. Certainly, the statement is not so far afield that it must be stricken.[2] The motion is denied, and the Court now turns to the merits of Pileco's motion for summary judgment on its breach of contract claim.

Under Illinois law,[3] to prevail on its breach of contract claim, Pileco would have to prove (1) the existence of a valid and enforceable contract; (2) substantial performance on its part; (3) a breach by SSI; and (4) resultant damages. *E.g., Fednav International, Ltd. v. Continental Ins.*, 624 F.3d 834, 839 (7th Cir. 2010)(citing Reger Dev., L.L.C. v. Nat'l City Bank, 592 F.3d 759, 764 (7th Cir. 2010); W.W. Vincent & Co. v. First Colony Life Ins. Co., 814 N.E.2d 960, 967 (Ill. App. 2004)). The parties do not dispute the existence of the contract. They do, however dispute the remaining elements. Pileco argues that it

---

[2]The same is true of SSI's Statement of Facts filed in connection with the motion for summary judgment on SSI's counterclaim. Pileco's motion to strike that statement is denied as well, as is Bauer's motion to strike.

[3]Although the Miller Act claim is governed by federal law, the parties agree that the state law claims, including Pileco's breach of contract claim, are governed by Illinois law. The Court does not quarrel with that assessment; indeed, the contract was executed in Illinois and the work performed under the bid took place in Illinois.

substantially performed its obligations under the contract, while SSI did not; SSI argues that it substantially performed its obligations under the contract, while Pileco did not. The question of whether Pileco substantially performed, or whether it did not (in which case, its breach would discharge SSI from performing its obligations under the contract) is a disputed issue at this point. Pileco concedes that the cutter was down for over 120 days during the rental period. That fact alone is enough to create a genuine issue of material fact, making summary judgment inappropriate.

Under Illinois law, a material breach by one party to a contract discharges the other from performing its obligations under the contract. *E.g., United States for the Use and Benefit of James Cape & Sons v. American Home Assurance Co.*, No. 02 C 1903, 2004 WL 3119029, at *7 (N.D. Ill. Dec. 3, 2004)(citing *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 527 (Ill. App. 1st Dist. 2000)). Thus, if, as SSI alleges, Pileco and Bauer really did breach the rental agreement by providing a defective cutter, failing to provide repair/replacement parts as provided, etc., then SSI may not have had a duty to pay or otherwise perform under the contract. Because issues of fact remain concerning Pileco and Bauer's performance, summary judgment on Pileco's claim is inappropriate.

Issues of fact also remain as to any damages sustained by Pileco. Although it asserts a concrete calculation for damages, that calculation is not provided for in the contract. And SSI disputes both Pileco's downtime number and its entitlement to some of the categories of costs for which it seeks damages. First, Pileco claims that the cutter was down for 120.85 days, and it cites to the deposition of David Pachan. But Mr. Pachan also testified that he was very conservative in arriving at the number of down days; he testified that he included only downtime that could clearly be associated with the actual equipment and that he did not include any of the downtime that was attributable to the Hose Tensioning System, which sometimes related to a cutter problem (which would add to the downtime equitable adjustment) and sometimes related to a crane problem, which would not be charged to Pileco. Pachan Dep., pp. 18, 21, 59-60. Thus, the amount of any equitable adjustment remains an open question to be determined by the trier of fact.

There is also a question concerning whether any additional remedies would be available to SSI. Pileco suggests that, because the contract provides for an equitable adjustment, that is the exclusive remedy available to SSI. But the contract certainly does not say that. And Pileco has offered no other evidence on the point.

Additionally, although the initial contract called for SSI

to make monthly rental payments of $88,800, there is some evidence to suggest that the parties had subsequently agreed to different terms, in an effort to settle their dispute about the performance of the cutter and other issues arising once cutting operations began. For example, the record suggests that, in April 2008, Pileco's COO, Don Mangum, was working with Dana Wesolek, who was then SSI's Vice President and later President, to come up with some settlement terms to bring to Bauer; the record shows that the parties went back and forth numerous times to try to settle their dispute, ultimately even drafting a settlement agreement to be executed by Bauer, Pileco and SSI. The agreement was never signed, but the agreement and the documentary evidence leading up to the agreement, suggest that the parties were contemplating – and may even have agreed to – a change in the terms of SSI's obligations under the rental agreement.

In fact, Pileco admits that it stopped sending rental invoices to SSI in May of 2008. Although Pileco claims it was a financial decision based upon tax issues, there is evidence in the record to suggest that Pileco stopped sending invoices because of a settlement reached by the parties: Kim Kingsbury, who handled the billing for Pileco, testified that, because of a resolution by the parties about the billing dispute, she was told to stop sending monthly invoices to SSI. Kingsbury Dep., p. 21.

This evidence, taken together, creates an issue of fact as to what, specifically, SSI was required to pay under the contract – both in terms of the types or categories of costs, and the amounts.

(2) <u>Pileco's Miller Act Claim Against F&D</u>

As noted above, in its complaint, Pileco alleges a claim against F&D under the Miller Act. Both Pileco and F&D have moved for summary judgment on this claim.

"The Miller Act provides a private right of action to an unpaid subcontractor on a federal project to collect on the bond posted for the project." *United States Department of the Navy v. Norden Enterprises*, No. 01 C 8968, 2004 WL 42318, at *4 (N.D. Ill. Jan. 6, 2004). Specifically, the Act states:

> Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due. 40 U.S.C. §3133(b)(1).

"The Miller Act was intended by Congress to provide protection to those material suppliers . . . whose labor and materials go into public projects. It requires the posting of surety bonds because normal state mechanics' lien rights are unavailable to subcontractors who perform work on federal

projects." *United States for the use and benefit of Westinghouse Electric Supply Co. v. Sisson*, 927 F.2d 310, 312 (7th Cir. 1991). "The Act's purpose is remedial," and it should be liberally construed in favor of the suppliers' recovery. *Id.* (citing *United States ex rel. Morris Construction, Inc. v. Aetna Casualty Ins. Co.*, 908 F.2d 375 (8th Cir. 1990); *United States ex rel. Consolidated Pipe & Supply Co. v. Morrison-Knudsen Co., Inc.*, 687 F.2d 129 (6th Cir. 1982)).

"An unpaid subcontractor on a federal project can obtain compensation from a bond posted under the Miller Act"; if the subcontractor was hired by the general contractor, it may proceed directly against the general contractor's bond. *U.S. ex rel. S & G Excavating, Inc.*, 236 F.3d 883, 884 (7th Cir. 2001). Thus, to the extent Pileco can show that it is an unpaid subcontractor, owed money under its contract with SSI, it would have the right to proceed on the bond. But was it unpaid? To be sure, there is evidence in the record to suggest that it was fully paid, that it was owed nothing more under the rental agreement. Although it claims that it would still be owed money, even if SSI were to receive the equitable adjustment allowed under the contract, SSI has offered evidence showing that Pileco's downtime number was low. And it has also offered evidence to show that, at some point, Pileco and Bauer appeared to be willing to concede that SSI owed no further rental payments.

Beyond that, even if the Court could say that Pileco was an unpaid subcontractor owed money under the contract with SSI, questions remain about how much Pileco would be owed. Both parties seem to concede that SSI would not be required to pay the entire amount due under the rental agreement if one were to simply multiply the monthly rental rate by the number of months in the rental period. But issues of fact remain concerning how much, exactly, it should pay, if anything. Pileco concedes that SSI is entitled to an equitable adjustment; yet the amount of that adjustment is disputed. As noted, at some point, Pileco and Bauer seemed to agree that no further rental payments were owed by SSI.

And there is some question about whether Pileco is entitled to recover all of the costs it has categorized as repairs – at least some of which were made after the cutter was returned in an attempt to refurbish the cutter for sale to a third party. Until these issues are resolved, the Court would have no way of fixing the amount due from F&D on the bond.

Pileco also argues that F&D should be on the hook for the entire unpaid balance owed under the contract, and that F&D is not entitled to any credits or offsets for amounts paid or given to SSI. Not so. Under the Miller Act, the surety pays what is owed by the contractor, no more. To allow Pileco to recover amounts from F&D that are not owed by SSI would grant a windfall

to Pileco that is not provided for in the Act. "It is a cardinal rule of the surety/principal relationship that a surety occupies the shoes of its principal and 'may avail himself of any defense' available to the principal other than those that are purely personal, such as bankruptcy or infancy." *Walton Technology*, 290 F.3d at 1209 (citing 72 C.J.S. Principal and Surety § 189 at 318-19 (1987)). Thus, if SSI has standing to challenge Pileco's entitlement to additional money under the contract, then so does F&D. The surety is liable on the payment bond to subcontractors who perform and meet the statutory requirements of the Act; given the issues of fact about whether Pileco "performed" and whether Pileco is truly owed anything under the contract, the question of F&D's liability cannot be resolved on summary judgment. Accordingly, the Court denies the motions for summary judgment on this claim as well.

B.    F&D's Motion for Summary Judgment

F&D filed its own motion for summary judgment. In it, F&D argues that, as a matter of law, (1) Pileco may not recover unpaid invoices from the sale of capital equipment that was not substantially consumed in the project; and (2) even if the agreement between SSI and Pileco could be considered a lease, under the Miller Act, Pileco is still precluded from recovering the damages it claims - namely, anything other than the cost of repairs made to equipment damages as the result of normal wear

and tear expected to occur during the bonded project.

First, F&D argues that it is entitled to summary judgment on Pileco's claim because the agreement between Pileco and SSI was a security instrument for the capital purchase of equipment, not a lease or rental agreement. F&D argues that, because this was a capital equipment sale agreement, and not a rental or lease agreement, Pileco is precluded from recovering any of its damages under the Pileco agreement. To support its argument, F&D argues that, under Illinois law, the question is whether the agreement gave SSI the option to buy the cutter for "no additional consideration or for nominal additional consideration upon compliance with the lease agreement." 810 ILCS 5/1-203(b). Under Illinois law, the option to buy provision did not necessarily transform the agreement from a rental agreement into a sales agreement; if it gave SSI the option to buy the cutter for a fixed price that was equal to or greater than its reasonably predictable fair market value at the time the option was to be performed, then it was still a rental agreement. 810 ILCS 5/1-203(c). And that would appear to be the case here.

Although it is clear that SSI had the option, under the agreement, to purchase the cutter, issues of fact remain as to how much it would have had to pay to do so. The addendum to the agreement provides, at paragraph 11, that "[t]he lessee has the right to purchase the quoted equipment at any time during the

rental period. The rental rates would be credited to the purchase price as follows: the first 3 months at 100% and the remaining months at 70%." *See* Complaint, Exhibit A, p. 7. At the end of the day, this was rental agreement, a lease, and not a purchase agreement. Although the agreement gave SSI the option to purchase the cutter during the term of the contract, it was clear that there would be a residual payment, with credits based upon the rental payments made to date and applied at various percentages. Although the Court is unable to determine the exact number for the purchase price – because there are so many variables in terms of the rental payments made and the timing of the purchase offer (which apparently never came, in any event), there is no question that the purchase price was intended to be more than nominal and that the total payments would approximate the cutter's fair market value. Accordingly, the Court rejects F&D's arguments to the contrary.

F&D also argues that, even if Pileco could recover something under the bond, it is not entitled to recover the full amount and types of damages it seeks. The Miller Act allows a subcontractor to collect, from the surety, what it is owed by the contractor. Here, the contract between Pileco and SSI provided that SSI would pay Pileco a monthly rental fee, calculated at a base rate of $88,800 per month, with an allowance for equitable adjustments for downtime. The contract also provided that SSI was

responsible for payment of equipment freight to and from the site and Pileco's yard; for maintenance and repair work not covered by the manufacturer's warranty (it does not specify what is or is not covered); for post-return cleaning and final repair of damages, if any, as specified in an off-hire report prepared at the end of the rental period; and for shipping costs for spare parts, including wear and tear items.

Pileco concedes that SSI paid it $557,695.65, and it concedes that SSI made five full rental payments and two partial payments. Statement of Facts, ¶22. SSI claims that, in addition to these payments, it "made additional check payments to Pileco for related parts, services and freight charges for a total sum of $831,516.70. Response to Statement of Facts, ¶22.

Pileco argues that SSI owes it unpaid rent on the cutter and related equipment in the amount of $1,955,200; unpaid invoices for repairs and parts in the amount of $1,633,332.05; unpaid repairs to the cutter upon its return in the amount of $603,027.58, plus another $28,038.51 for the preparation of the report leading to these repairs; $557,502.13 in unpaid repairs performed by Bauer; disassembly charges in the amount of $8,880.00; and finance charges in the amount of $156,325.38.

With respect to the rent, issues of fact remain as to the exact amount owed, including the total downtime and the amount of the equitable adjustment. With respect to the post-return

repairs, issues of fact also remain. The contract requires SSI
to pay "for cleaning and the final repair of damages (if any), as
specified in an off-hire report at the end of the rental period."
Rental Agreement, ¶9. Bruce Bradley went to the job site to
prepare the off-hire report for Pileco and was there, on and off,
for a period of two weeks in January 2009, after the cutting work
had been completed and the cutter had been decommissioned at the
site. Mr. Bradley testified that he served more as a supervisor
for the report and that the actual inspection was done by SSI
employees; he testified that this slowed things down for him but
did not limit his ability to prepare his report. Bradley Dep.,
pp. 80-81. After receiving Mr. Bradley's off-hire report, and
getting the cutter back to its yard in Houston, Pileco hired
George Junker Engineering, a German company, to prepare a report
on the condition of the cutter; this report (the "Junker report")
was apparently wildly inconsistent with Mr. Bradley's report, and
estimated that it would cost $603,027.58 to "refurbish" the
cutter. The contract does not say anything about refurbishment;
nor does it require SSI to pay for the preparation of the off-
hire report or a report such as the Junker Report.

Additional issues of fact remain concerning the claimed
amounts for repairs and parts; are those amounts included in
SSI's claimed payments? Also, are any of the unpaid repair and
parts costs covered by warranty? Pileco appears not to have made

any accommodation for warranty coverage, yet the contract provides that SSI is not responsible for maintenance and repair work that is covered by the manufacturer's warranty. Until these issues are resolved, the Court is unable to determine the amount of damages. Summary judgment is not appropriate.

F&D also questions Pileco's right to recover finance charges under the bond. Additionally, F&D argues, because Bauer did not have a contract with SSI, its ability to assess interest is tied to the provisions of Illinois law, which allow prejudgment interest to be assessed for the limited period beginning when the suit is filed through the date judgment is rendered, and only at the rate of 5% per annum. It appears from Pileco's damages calculation that it is seeking interest at the rate allowed under Illinois law. But, until the underlying damages amount is fixed – an open question at this point – the interest on that award cannot be calculated.

In sum, the Court finds that, as a matter of law, the agreement between Pileco and SSI was a lease agreement, not an agreement for the purchase of capital equipment. Thus, the Court rejects F&D's arguments about Pileco's eligibility to collect under the bond in the first instance. Having said that, however, the Court does credit F&D's arguments about the specific costs to be included in the award. Although the specific components of the damages calculation cannot be determined at this time, given

the many issues of fact surrounding that calculation, it is clear that Pileco is limited in its recovery to the provisions of the contract; unless the contract requires SSI to pay for a particular category of costs, those costs are not due under the contract and they cannot be recovered under the bond.

    C.   <u>Pileco's Motion for Summary Judgment on SSI's Counterclaim</u>

In addition to seeking summary judgment on its complaint against SSI, Pileco seeks summary judgment on SSI's counterclaim. In its Second Amended Counterclaim, SSI alleges nine counts: (1) breach of contract; (2) breach of express warranty; (3) breach of implied warranty of merchantability; (4) breach of the implied warranty of fitness for a particular purpose; (5) promissory estoppel; (6) alternative breach of contract (Bauer); (7) alternative breach of contract (Pileco and Bauer); (8) alternative declaratory judgment; and (9) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. All are asserted against both Pileco and Bauer, except for count 6, which is asserted against Bauer alone. Bauer has filed its own motions seeking to summarily dispose of these claims as well.

    (a)   <u>Counts 1-4</u>

Pileco argues that it is entitled to summary judgment on counts 1 through 4 (the breach of contract and breach of warranty counts) because, as the undisputed record shows, SSI did not substantially perform, Pileco did not breach and SSI did not

suffer any damages. But that is not true. SSI has introduced evidence showing that the equipment provided under the rental agreement failed to perform in the manner contemplated; indeed, Pileco concedes that the cutter was "down" for 120.85 days. And there is no question that the cutting operations took much longer than expected, causing SSI to incur expenses and losses. What's more, Pileco claims that SSI owes it more than $2 million in repair-related and parts-related expenses; a jury could reasonably find that some or all of this relates to performance problems with the rental equipment.

Pileco argues that the contract provides for an equitable adjustment to SSI in the event of a delay or any problems with the cutter or other equipment and that those can't be counted as damages because the contract provides for this particular remedy and nothing else. But the contract does not expressly limit damages to the equitable adjustment. And, in fact, if SSI incurred additional costs because of the downtime – which it alleges – then a jury could reasonably find that those costs could be included in SSI's damages.

Pileco also argues that SSI cannot succeed on any of its breach of express warranty claim because "[t]he undisputed facts of this case establish that every warranty claim covered by the terms of the express warranty [was] honored." Motion, p. 8 (citing Statement of Facts, ¶37). Also, Pileco argues that it is

entitled to summary judgment on the other warranty claims because "SSI has adduced no proof that such breaches ever occurred." *Id.* In fact, Pileco argues, the cutter *was* fit for its intended purpose and it was, in fact, merchantable, as evidenced by the fact that SSI used the cutter to complete its work on the project, netting more than $16 million in the bargain. Pileco concedes (for purposes of these motions) that the cutter was "down" for a total of 120.85 days, and it concedes that SSI is entitled to an "equitable adjustment" for that downtime; it argues, however, that the downtime in no way excused SSI from its performance obligations under the contract.

First, if the issues at the job site amounted to a breach of Pileco's performance obligations under the contract, then, in fact, that breach could very well, as a matter of law, excuse SSI from its performance obligations under the contract. *E.g., United States for the Use and Benefit of James Cape & Sons v. American Home Assurance Co.*, No. 02 C 1903, 2004 WL 3119029, at *7 (N.D. Ill. Dec. 3, 2004)(Under Illinois law, a material breach by one party to a contract discharges the other from performing its obligations under the contract.)(citing *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 738 N.E.2d 524, 527 (Ill. App. Ct. 2000)).

Additionally, although it is not clear that the parties ever agreed to a final set of settlement terms, it is clear that, at

some point in mid-2008, at least Pileco (if not Bauer) was willing to release SSI from its obligation to pay certain rental payments. Presumably, it would not have been willing to do so if it hadn't had something to gain in the bargain. This evidence suggests that, in both Pileco and SSI's view, other remedies remained available under the contract.

Pileco represents that "the undisputed facts of this case establish that during the time that SSI used the Pileco equipment, SSI submitted warranty claims to Pileco that were honored by Bauer that totaled $388,068.19." Motion, p. 10 (citing Statement of Facts, ¶37). Accordingly, Pileco argues, the claim is essentially moot, and summary judgment is appropriately entered in its favor. But SSI disputes that it received all of the warranty credits to which it was entitled. And it is not clear that the costs included in Pileco's and Bauer's unpaid repairs number are exclusive of costs covered under the warranty.

(b) Counts 5 & 8

Pileco also argues that it is entitled to summary judgment on counts 5 and 8 of SSI's Second Amended Counterclaim, which allege, respectively, promissory estoppel and declaratory judgment. Pileco argues that it is entitled to summary judgment on SSI's promissory estoppel claim because, although the parties did engage in settlement negotiations, "[t]here was never a

clear, definite, unambiguous promise to settle." Motion, p. 11.

To establish a claim for promissory estoppel in Illinois, a plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment. E.g., *Janda v. U.S. Cellular Corp.*, No. 1-10-3552, — N.E.2d —, 2011 WL 5903452, at *17 (Ill. App. Ct. Nov. 18, 2011)(citing *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520 (2009); *Quake Construction, Inc. v. American Airlines, Inc.*, 565 N.E.2d 990 (1990)). Although Pileco contends that it never made any unambiguous promises to SSI; SSI disagrees.

The record shows that Pileco and SSI engaged in settlement negotiations for several weeks, to the point where Pileco had drafted a settlement agreement, SSI had made changes thereto, and Pileco had agreed to take the draft to Bauer for approval. The parties dispute whether they actually came to a meeting of the minds with respect to settlement; Pileco claims that the negotiations went back and forth, but fizzled before any agreement in principle could be reached, while SSI claims that the parties, in fact, had an agreement in principle that was lacking only formal execution of the documents.

The record includes a number of emails and letters between Don Mangum, COO of Pileco, and Dana Wesolek, who was, at the time

Vice President, and later President of SSI.  On April 18, 2008,
Mr. Mangum wrote to Ms. Wesolek to advise her that he was going
to Germany and that he would like to have a proposal to discuss
with Bauer to "bring this to completion."  *See* Pileco's Statement
of Undisputed Facts as to SSI's Counterclaim, Exhibit 55. Within
the week, Ms. Wesolek responded with a list of terms; among them
was a demand that rental payments on the cutter be discontinued
and that outstanding invoices be credited to a zero balance.
*Id.*, Exhibit 56.  Mr. Mangum responded with a demand that SSI pay
$500,000 of the current rental debt, among other things.  *Id.*,
Exhibit 57.  Mr. Mangum and Ms. Wesolek continued to go back and
forth.  On July 31, 2008, Mr. Mangum wrote to Ms. Wesolek to
advise that he had "finished the settlement agreement, but I am
waiting on final approval from Germany."  *Id.*, Exhibit 67.  On
September 30, 2008, Mr. Mangum finally sent the Settlement
Agreement and Release of Claims to SSI.  *See id.*, Exhibit 73.
The agreement included a provision that the outstanding invoices
billed from both Pileco and Bauer to SSI would be written off and
credited to a zero balance.  *Id.*, Exhibit 73, ¶¶4-5.  During the
first week of October 2008, SSI came back with some changes; two
weeks later, SSI still had not heard back from Mr. Mangum.  On
October 21, 2008, Ms. Wesolek wrote to Mr. Mangum to ask about
the status of the agreement; it is not clear that he ever
responded.

To be sure, the fact that a settlement agreement was never signed supports Pileco's argument that it never made any unambiguous promises to SSI. But there is some evidence in the record to suggest that even Pileco thought the parties had a deal: Kim Kingsbury, who handled the billing for Pileco, testified that, because of a resolution by the parties about the billing dispute, she was told to stop sending monthly invoices to SSI in May of 2008. Kingsbury Dep., p. 21. Thus, a jury could reasonably conclude from this evidence that Pileco had promised to zero out the rental payment invoices, and that both parties – Pileco and SSI – acted on that promise. Accordingly, the Court denies Pileco's motion for summary judgment on the promissory estoppel claim.

The same result obtains on the alternative declaratory judgment count. In Count 8, SSI alleges that Pileco and SSI agreed to the terms reflected in the "Settlement Agreement and Release of Claims" drafted by Pileco and circulated to SSI. SSI concedes that the document was never formally executed, but argues that it is nonetheless a valid and enforceable contract, the terms of which supercede the terms spelled out in the initial rental agreement. SSI seeks a declaratory judgment to that effect. Pileco argues that it is entitled to judgment as a matter of law on this claim because, in fact, final terms were never agreed upon and no firm promises were ever made along those

lines. Based upon the evidence in the record, however, a jury could reasonably conclude otherwise. If, as SSI alleges, Pileco and SSI actually had a meeting of the minds about the settlement terms, then SSI would, for example, no longer be obligated to pay the rental amounts claimed. Given the communications between Pileco and SSI, a jury could reasonably find that there was, in fact, a meeting of the minds as to these terms. Accordingly, the motion for summary judgment as to Pileco on this claim is denied.

### (c)   Count 7

Pileco also seeks summary judgment on count 7, SSI's "alternative breach of contract" claim; Pileco argues that this count fails to state a claim because Pileco cannot be held accountable for any liability imposed on Bauer. But the record evidence suggests that that may not be true. For purposes of the initial rental agreement, the evidence shows that Bauer was calling the shots and controlling the deal; it was Bauer, not Pileco, that helped SSI prepare its bid, and it was Bauer, not Pileco, that advised SSI as to the necessary equipment for the CUP Reservoir Project. But, for some reason (whether for some innocuous or legitimate business purpose, or in an attempt to shield itself from liability), Bauer had Pileco issue and sign the rental agreement, the terms of which were negotiated by Bauer. Although the record does not explain why Pileco was brought in to the deal in this way, under the circumstances, a

jury could reasonably find that Pileco may, consistent with the law, be held liable for actions taken or not taken by Bauer. Accordingly, the motion for summary judgment as to this claim is denied.

(d) <u>Count 9</u>

Finally, Pileco seeks summary judgment on count 9, SSI's Illinois Consumer Fraud Act claim. The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010)(citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). To prevail on a claim under this statute, SSI would have to prove: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce. *Id.* (citing *Robinson*, 775 N.E.2d at 960; *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008)).

In addition, to prevail under ICFA, a plaintiff must demonstrate that the defendant's conduct is the proximate cause of the injury. *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 160 (2002)("Unlike an action brought by the Attorney General under [ICFA], which does not require that

'any person has in fact been misled, deceived or damaged[,]' ...
a private cause of action brought under [ICFA] requires proof of
'actual damage.' ... [and] proof that the damage occurred 'as a
result of' the deceptive act or practice." (citations omitted));
*Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514-15 (7th Cir. 2006);
*Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296
Ill.Dec. 448, 835 N.E.2d 801, 861 (2005) ("Proximate causation is
an element of all private causes of action under the Act.").

"The actual damage element of a private ICFA action requires
that the plaintiff suffer 'actual pecuniary loss.'" *Kim v.
Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010)(citing *Mulligan
v. QVC, Inc.*, 888 N.E.2d 1190, 1197 (Ill. App. Ct. 2008). But,
in its counterclaim, SSI alleges such loss; specifically, it
alleges that the problems, failures and breakdowns related to the
cutter and its performance at the Project resulted in excessive
down time, delays and expenditures, causing SSI to sustain
significant financial losses on the Project." Second Amended
Counterclaim, ¶93. Although Pileco denies SSI's allegation of
financial losses, issues of fact remain concerning the claim that
make summary judgment inappropriate.

Pileco also argues that this is a breach of contract case,
not a consumer fraud case, and that the statute requires
something more than just an allegation that the defendant
promised to do something but did not. SSI alleges more. SSI

alleges that Bauer and Pileco knew about certain defects in the cutter that caused exactly the type of problems SSI faced, and that it deliberately kept this information from SSI, instead persistently blaming the problems on SSI and on other equipment at the job site; SSI further alleges that, while SSI was using the cutter and experiencing problems, Bauer was, in fact, making design changes to certain components of the cutter to rectify problems experienced by its customers, yet it never addressed the issue with SSI. *See* Second Amended Counterclaim, ¶¶95-101. Accordingly, the Court rejects Pileco's arguments on SSI's ICFA claim.

     D.    <u>Bauer's Motion to Dismiss (Counts 1-4, 6-7)</u>

Bauer has moved to dismiss counts 1 through 4, 6 and 7 of SSI's Second Amended Third Party Complaint under Rule 12(b)(6). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted; it should be granted only if it appears beyond all doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *E.g., Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss under 12(b)(6), the Court accepts as true all well pleaded facts alleged in the complaint (or in this case the counterclaim) and it draws all reasonable inferences from those facts in favor of the non-moving

party (in this case, SSI). *See, e.g., Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977-78 (7th Cir. 1999). The Court does not ask whether SSI will ultimately prevail; rather, it asks whether it is entitled to offer evidence to support its claims against Bauer. *E.g., Smith v. Cash Store Mgmt., Inc.,* 195 F.3d 325, 327 (7th Cir. 1999).

Initially, the Court notes that Bauer's motion is untimely, coming as it does after Bauer answered the complaint, *see* Fed. R. Civ. P. 12(b). But even if it were timely, it would still be denied. And converting the motion to one for summary judgment does not help. No matter how you slice it, these claims cannot be summarily disposed of on the record before the Court.

Bauer argues that SSI's complaint fails to state a claim for breach of contract, or for breach of warranty under Illinois law. Turning first to the breach of contract claim, as Bauer correctly notes, under Illinois law, a cause of action based on a contract may be brought only by a party to that contract or by one in privity with such party. Bauer seeks to assert this point of law to shield it from liability, given that it was not a party to the contract executed by and between SSI and Pileco. But, as the allegations make clear, SSI negotiated the contract with Bauer, the equipment was owned by Bauer and Bauer carried the warranties on the cutter; the fact that its wholly-owned subsidiary actually signed the contract does not let Bauer off the hook. Under the

circumstances, the Court is not persuaded that there are no facts that could give rise to a breach of contract claim against Bauer. Accordingly, the motion to dismiss the breach of contract claim is denied.

The same is true with respect to the breach of warranty claims; it is clear that Bauer was involved with the warranty claims and it cannot hide behind its wholly-owned subsidiary. Bauer argues that it is "implausible to suggest that Pileco was acting as Bauer's agent in this matter." Motion to Dismiss, p. 10. Quite the opposite – Bauer negotiated the terms of the contract, created the quote and then had its wholly-owned subsidiary sign the final contract; it remained involved afterward though, working to make repairs and negotiate warranty terms. Indeed, the very person who signed the agreement on behalf of Pileco testified that the masterminds behind the agreement all worked for Bauer. *See* Smith Dep., p. 24, 26. He even testified that "Bauer was a party to the contract. They owned Pileco." Smith Dep., 55, 56. It is absurd for it to now claim that it is implausible to suggest that it was involved.

    E.   <u>Bauer's Motion for Summary Judgment (Counts 5, 8, 9)</u>

Bauer has also moved for summary judgment on Counts 5, 8 and 9 of SSI's Second Amended Third Party Complaint. In Count 5 of its Third Party Complaint, SSI alleges that Bauer and Pileco, in discussions attempting to resolve the various disputes under the

agreement, made a series of promises, upon which SSI relied, to its detriment. In Count 8, SSI alleges that the latest version of the draft settlement agreement constitutes a valid and enforceable contract between the parties and that it substantially performed under that contract; SSI seeks a declaratory judgment that the contract is valid and enforceable against Bauer.

As explained above, to establish a claim for promissory estoppel in Illinois, a plaintiff must prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment. *E.g., Janda v. U.S. Cellular Corp.*, No. 1-10-3552, — N.E.2d —, 2011 WL 5903452, at *17 (Ill. App. Ct. Nov. 18, 2011)(citing *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520 (2009); *Quake Construction, Inc. v. American Airlines, Inc.*, 565 N.E.2d 990 (1990)).

Just as a jury could reasonably conclude from the evidence that Pileco and SSI had a meeting of the minds as to the settlement terms, a jury could reasonably find that Bauer was a part of the deal. In a July 29, 2008 email, Don Mangum sent an email to Robert Kaindl, with a copy to George Smith, both at Bauer. He wrote: "[a]ttached is a copy of the settlement agreement for Slurry. Please look over and see if you have any

questions. I believe this is what we agreed to. Once you let me know that Mr. Burger has agreed to this I will forward a copy to Slurry for signature." Pileco's Statement of Facts as to SSI's Counterclaim, Exhibit 66. Although the record does not include a response from Bauer, it is clear that Mr. Mangum sent the agreement to SSI a couple of months later, on September 30, 2008. *See id.*, Exhibit 73. From this, a jury could reasonably conclude that Bauer had approved the terms of the agreement. And, if a jury so found, it could also find for SSI on the declaratory judgment count, which is also predicated on an agreement by the parties to settlement terms to supplant the terms of the initial rental agreement. Accordingly, the Court denies Bauer's motion for summary judgment on Counts 5 and 8.

Finally, Bauer argues that it is entitled to summary judgment on Count 9, which alleges violation of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act. Bauer argues that the ICFA is inapplicable, that SSI is not a "consumer" and lacks standing to sue under the ICFA, and that SSI's claims are barred by the applicable statute of limitations.

"As its name indicates, the Consumer Fraud Act is primarily concerned with protecting consumers." *Industrial Specialty Chemicals, Inc. v. Cummins Engine Co.*, 902 F.Supp. 805, 811 (N.D. Ill. 1995)(citing *Hill v. Names & Addresses, Inc.*, 571 N.E.2d 1085, 1101 (Ill. App. Ct. 1991); *Jay's Foods, Inc. v. Frito-Lay,*

*Inc.*, 664 F.Supp. 364, 368 (N.D. Ill. 1987)). But a plaintiff need not actually be a consumer, as that term is normally contemplated. The Act defines a consumer as one "who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). Thus, businesses have standing to sue too. *See Industrial Specialty*, at 812(citing 815 ILCS 505/1(c); *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.*, 657 F.Supp. 1486, 1493 (N.D. Ill. 1987). "[W]hen the dispute involves two business, 'the test for standing is whether "the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns."'" *Id.* (quoting *Gadson v. Newman*, 807 F.Supp. 1412, 1421 (C.D. Ill. 1992); *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 41 (Ill. App. Ct. 1989); *Zinser v. Rose*, 614 N.E.2d 1259, 1263 (Ill. App. Ct. 1993)). "To establish a violation of the Act, plaintiff must show a misrepresentation, concealment or omission of a material fact with intent that others rely upon that fact." *Graphic Sales, Inc. v. Sperry Univac Div., Sperry Corp.*, 824 F.2d 576, 580 (7th Cir. 1987)(citing *General Motors Acceptance Corp. v. Grissom,* 501 N.E.2d 764, 765 (1986)). SSI's claim satisfies this test; SSI alleges that, based upon its experience with other customers, Bauer knew about certain problems with the cutter, yet

did not disclose those problems to SSI - on the contrary, it consistently blamed SSI for the problems, causing SSI to incur delays and losses as a result.

Nor can the Court say that the claim is barred by the statute of limitations. Actions under the ICFA "shall be forever barred unless commenced within 3 years after the cause of action accrued." 815 ILCS 505/10a(e). Under the Illinois "discovery rule," causes of action accrue when the plaintiff is "possessed of sufficient information concerning its injury to put a reasonable person on inquiry to determine whether actionable conduct was involved." *Vector-Springfield Props., Ltd. v. Cent. Ill. Light Co., Inc.*, 108 F.3d 806, 809 (7th Cir. 1999). A plaintiff can plead himself out of court if he alleges facts that affirmatively show that his suit is time-barred, but a plaintiff need not negate an affirmative defense, such as the statute of limitations, in his complaint. *See Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003).

In its counterclaim, SSI alleges that it "began its cutting operations in approximately October 2006 . . . ." Second Amended Counterclaim, ¶29. And that "[t]hereafter, SSI experienced persistent and continued problems with the Cutter operation, including, inter alia, repeated breakdowns of the Cutter, as well as the Cutter's gear box, drive units, and cutting wheels, which continually had to be repaired, replaced and/or rebuilt. . . .

These Cuter-related problems and equipment break downs lasted throughout the duration of the Project, and SSI continually and repeatedly complained to Bauer and Pileco about such problems without any resolution by Bauer or Pileco." *Id.*, ¶30. SSI alleges that, although Bauer and Pileco repeatedly "blamed the problems and issues on the Leibherr Crane and on SSI's failure to properly operate the Cutter, as well as on supposedly inaccurate information supplied to it by SSI prior to entering into the Subcontract," "[i]n fact, unbeknownst to SSI, Bauer was experiencing similar problems with the Cutter on other projects with other customers . . . and was "making design changes to certain components of the Cutter, including the pressure compensator, in order to rectify the problems the Cutter was experiencing in the field." *Id.*, ¶¶95, 97-98. SSI further alleges that, "[d]espite its knowledge of the aforementioned problems and defects with the Cutter, Bauer failed to disclose them to SSI for the express purpose of inducing SSI to complete the Project using the Cutter so that Bauer could recover the Cutter, repair it and resell it, and then make a claim on SSI's multi-million dollar performance bond, all of which it eventually did." *Id.*, ¶99. These allegations do not allow for an exact date for purposes of triggering the statute of limitations. But they do disclose a range, which would begin on day one of the cutting operations (some time in October of 2006) and end with

42

the date on which SSI learned of the defects, Bauer's knowledge of the defects and Bauer's attempts to correct the defects. Given that the bulk of this range falls within the statute of limitations period, it is entirely possible that a jury could find that SSI discovered its claim within the three years preceding the filing of the counterclaim. Accordingly, Bauer's attempt to bar the claim on this basis is rejected.

F.    F&D's Motion to Dismiss for Failure to Prosecute

Most recently, F&D filed a motion to dismiss Pileco's and Bauer's motions for failure to prosecute. The motion is predicated on Pileco's and Bauer's motions to strike certain of F&D and SSI's joint filings submitted in response to Pileco's and Bauer's motions for summary judgment, because neither party noticed its motion for presentment in court. These motions suggest to this Court that the case has become increasingly and unnecessarily combative, and that the parties seem to have become more interested in fighting and nit-picking than in resolving their core disputes. The motion to dismiss, like the motions to strike, is denied.

**Conclusion**

For the reasons set forth above, Pileco's Motion for Summary Judgment on its Complaint [#104] is denied; Pileco's Motion for Summary Judgment on SSI's Second Amended Counterclaim [#107] is denied; F&D's Motion for Summary Judgment [#119] is denied;

43

Bauer's Motion to Dismiss Counts 1 through 4, 6 and 7 of SSI's Second Amended Counterclaim [#114] is denied; and Bauer's Motion for Summary Judgment on Counts 5, 8 and 9 of SSI's Second Amended Counterclaim [#110] is denied. Pileco's Motions to Strike [#162 and #164] are denied, as are Bauer's Motion to Strike [#166] and F&D's Motion to Dismiss for Failure to Prosecute [#170].

Date: February 8, 2012

E N T E R E D:

_Arlander Keys_

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT